William A. PARUS, Plaintiff,

and

GERMANTOWN MUTUAL
INSURANCE COMPANY,
Intervening Plaintiff,

v.

Andrew C. Cator, Thomas Kroeplin, Dawn Bresnahan, individually and in her official capacity as an employee of the Town of Minocqua Police Department, Town of Minocqua, Wisconsin, Clay Kreitlow, individually and in his capacity as an employee of the Town of Woodruff Police Department, and Town of Woodruff, Wisconsin, Defendants.

No. 05–C–0063–C.

United States District Court,
W.D. Wisconsin.

Nov. 14, 2005.

Richard M. Burnham, Neider & Boucher, S.C., Madison, WI, for Plaintiff.

Michael J. Modl, Axley Brynelson, LLP, Madison, WI, Mark P. Wendorff, Wendorff, Ellison, Noteboom & David, Wausau, WI, Charles D. Hoornstra, Assistant Attorney General, Madison, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

In this civil action for monetary relief, plaintiff William Parus contends that defendant Andrew Cator illegally obtained plaintiff's personal information from the Department of Motor Vehicles database and defendant Thomas Kroeplin illegally obtained and disclosed the same information in violation of the Driver's Privacy Protection Act of 1994, 18 U.S.C. § 2721. Jurisdiction is present under 28 U.S.C. § 1331.

This case is before the court on defendants Cator's and Kroeplin's motions for summary judgment. (Intervening plaintiff Germantown Mutual Insurance Co. has not filed a response to defendants' motion. Because it plays no role in this motion, all references to "plaintiff" will be to William Parus.) Defendants Bresnahan and Town of Minocqua have filed a separate motion for summary judgment, which will be decided in a separate order.

From the parties' proposed findings of fact, I find the following to be material and undisputed.

## UNDISPUTED FACTS

Plaintiff William Parus, defendant Andrew Cator and defendant Thomas Kroeplin are all residents of Minocqua, Wisconsin.

Defendant Cator was once romantically involved with Julie Erickson, who is the mother of one of his children. Sometime before September 20, 2004, plaintiff began dating Erickson. On September 20, 2004, defendant Cator observed a red Corvette parked in Erickson's driveway. At that time, defendant Cator did not know plaintiff.

Defendant Cator went to the Town of Woodruff Police Department, attempting to learn the identity of the vehicle's owner. The police officer on duty, defendant Krietlow, told him only that the vehicle's owner was a "local guy."

Next, defendant Cator called his aunt, Sherry Kroeplin, and asked her whether his uncle, defendant Thomas Kroeplin, would "run a [license] plate" for him. (Defendant Kroeplin has been employed as a conservation warden with Wisconsin Department of Natural Resources for 26 years. As a conservation warden, defendant Kroeplin is a state of Wisconsin law enforcement officer. In his work, defendant Kroeplin calls the Minocqua Police Department to run license plate numbers approximately four to five times a month.) Defendant Cator did not tell his aunt why he wanted the license plate information. Sherry Kroeplin relayed defendant Cator's request to her husband, who was off duty at the time.

At 1:42 p.m., soon after learning of defendant Cator's request, defendant Kroeplin called Minocqua police dispatcher defendant Dawn Bresnahan. They had the following conversation:

Bresnahan: Minocqua Police, Dawn.

Kroeplin: Hi, Dawn. Tom Kroeplin.

Bresnahan: Hi, Tom.

Kroeplin: Can you run me a plate, please?

Bresnahan: Uh-oh.

Kroeplin: Uh-oh, what?

Bresnahan: Can I tell which plate you're looking for?

Kroeplin: Go ahead.

Bresnahan: Four, four, zero, Frank Mary John.

Kroeplin: How did you figure that out?

Bresnahan: And I'm not giving it to you.

Kroeplin: Oh, okay.

Bresnahan: Because I was just warned somebody was looking for that plate.

Kroeplin: What's going on?

Bresnahan: He just wants to know because he's snooping.

Kroeplin: Ah.

Bresnahan: Because he says he wants to buy that vehicle, but he wants to know. And alls we tell him is it's a local.

Kroeplin: Okay.

Bresnahan: So I was advised. I cannot give this plate out.

Kroeplin: Ah.

Bresnahan: I'm sorry.

Kroeplin: I won't tell.

Bresnahan: Alls it is is Bill Parus.

Kroeplin: Oh. Okay.

Bresnahan: But...

Kroeplin: They must be having a little bit of a squabble or something.

Bresnahan: I don't know what's going on there, but we're not giving it out. So you can't give it out.

Kroeplin: Nope. I won't.

Bresnahan: All right.

Kroeplin: Okay. Bye.

Bresnahan: Bye.

Defendant Bresnahan had "run the plate" for defendant Krietlow before defendant Kroeplin called her. She gave defendant Kroeplin the information he requested because she trusted him, it was not her job to hold back information from a law enforcement officer when he requested it and he assured her he would not release the information. Defendant Bresnahan did not disclose plaintiff's address to defendant Kropelin. Defendant Kroeplin knew from his training that he could obtain and use personal information from a motor vehicle record only for a law enforcement purpose.

At 2:10 p.m., Julie Erickson called 9–1–1 to report that she had been threatened by defendant Cator. Shortly after her call was made, Minocqua police officer Brad Petersen arrived at her home in response to the call. While he was in Erickson's

house, defendant Cator telephoned the residence once again. Officer Petersen answered and identified himself.

Meanwhile, after completing his conversation with defendant Bresnahan, defendant Kroeplin called defendant Cator, who told defendant Kroeplin that he was concerned about his child and about the car he had seen in Erickson's driveway. (The parties dispute whether defendant Kroeplin disclosed plaintiff's identity to defendant Cator.)

Shortly before 2:44 p.m., defendant Kroeplin saw defendant Cator leave his home. (Defendant Kroeplin and defendant Cator are neighbors.) At 2:44 p.m., defendant Kroeplin called the Minocqua Police Department a second time. The conversation went as follows:

Gillich: Minocqua Police, Crystal.

Kroeplin: Yeah, Crystal. Is, uh, Dawn around yet?

Gillich: Yeah, hang on a second.

Kroeplin: Okay.

Bresnahan: Minocqua Police.

Kroeplin: Hey, Dawn.

Bresnahan: Yeah.

Kroeplin: Tom Kroeplin here.

Bresnahan: Yeah.

Kroeplin: This is a regular Peyton Place.

Bresnahan: Is what?

Kroeplin: I said, this is a real Peyton Place around here. Ah, I guess [Officer] Brad [Petersen]'s over at Andy [Cator's] girlfriend's. Julie Erickson.

Bresnahan: Yeah.

Kroeplin: Okay.

Bresnahan: Yep, whole problem.

Kroeplin: Right. And, and Andy [Cator] just left now, really going like a bat out of hell.

Bresnahan: From? From?

Kroeplin: From his home here on Seventy.

Bresnahan: On Seventy? Okay.

Kroeplin: I don't know if he's going over there. But I just wanted to... I don't think he is but just-

Bresnahan: Just out (?) Okay. Yeah. So yeah, that was obviously why he was trying to figure out that plate.

Kroeplin: Right.

Bresnahan: Mmm-hmm.

Kroeplin: I don't know.

Bresnahan: Yeah. So...

Kroeplin: Ah.

Bresnahan: You know, if he's try You got to be careful with this 'cause you could tie us all in.

Kroeplin: Right, but he doesn't know who it is.

Bresnahan: Yeah, I know.

Kroeplin: I didn't tell him or anything like that.

Bresnahan: Right. Right.

Kroeplin: Ah, so he seemed like he was-

Bresnahan: Okay.

Kroeplin: Pretty well... ah... he was okay when she was talking to him, but like I said-

Bresnahan: Yeah, he peeled out, huh?

Kroeplin: He seemed like he was in a big hurry and-

Bresnahan: Well, I hope there's no more problems.

Kroeplin: I hope not.

Bresnahan: Yeah, okay.

Kroeplin: Just to let ya's know.

Bresnahan: All right. Thanks Tom.

Kroeplin: All right, bye.

On September 20, 2004, plaintiff no longer resided at the address listed for him in the Minocqua telephone directory. The address listed in the directory was located between 4 and 8.6 miles from defendant Cator's home. On September 20, 2004, plaintiff's former residence was being de-molished. Any passerby could easily tell that the home was no longer occupied.

Between three and fifteen minutes after reporting to defendant Bresnahan that defendant Cator had "taken off," defendant Kroeplin called the police department for a third time and spoke with dispatcher Crystal Gillich. The conversation was follows:

Gillich: Minocqua Police, Crystal.

Kroeplin: Yeah, Crystal. Please tell Dawn he's back home now.

Gillich: He's back home now?

Kroeplin: Yeah.

Gillich: All right, I'll let her know.

Kroeplin: Okay. Bye.

Gillich: Thanks. Bye.

That evening, at or after 5:30 p.m., defendant Cator spoke with his friend, Freja Van Skyhawk. During the conversation, defendant Cator described plaintiff's car as a red Corvette. Van Skyhawk told defendant Cator that she believed the car he had described belonged to plaintiff because she had seen plaintiff driving a red Corvette. She had also heard her child and a friend talking excitedly about plaintiff's sports car.

On September 20, 2004, and for several months thereafter, defendant Kroeplin told his wife that defendant Bresnahan had not provided him with information about the license plate or its owner in response to his inquiry. When finally defendant Kroeplin admitted to his wife that defendant Bresnahan had given him the information he requested, he told his wife that he had "kept [his] word" and not disclosed the owner's name to defendant Cator.

On January 3, 2005, defendant Kroeplin's supervisor, Tom Wrasse, met with Kroeplin to discuss defendant Kroeplin's actions on September 20, 2004. At that meeting, defendant Kroeplin apologized to Wrasse and stated that he felt he had "let down" the Wisconsin Department of Natu-

ral Resources. During the meeting, defendant Kroeplin did not say that defendant Cator was a Department of Natural Resources informant.

At some point prior to January 4, 2005, Wrasse met with Norbert McMahon, the Minocqua Chief of Police, who had investigated the disclosure of plaintiff's motor vehicle record information. On January 4, 2005, Wrasse prepared a written summary of the meeting that included the following sentence: "McMahon indicated that [plaintiff's motor vehicle record] information was then transferred to Kropelin's nephew Andy Cater [sic] for non-law enforcement purposes." Wrasse dep., dkt. # 99, at 13. However, McMahon never told Wrasse that defendant Kroeplin disclosed plaintiff's information to defendant Cator. When defendant Kroeplin brought Wrasse's January 4 report to the attention of Chief McMahon, McMahon met again with Wrasse. Wrasse admitted that the report was poorly written and agreed that McMahon never told him that defendant Kroeplin had disclosed plaintiff's personal information to defendant Cator.

On January 31, 2005, defendant Kroeplin was reprimanded by the Department of Natural Resources in a letter written by Wrasse. Wrasse believed defendant Kroeplin had used poor judgment by obtaining plaintiff's information without first verifying that defendant Cator wanted the information for a law enforcement purpose. Wrasse provided no other reason for disciplining defendant Kroeplin. The letter of reprimand stated that defendant Kroeplin had admitted his conduct was inappropriate and had apologized. After the letter of reprimand was issued, defendant Kroeplin grieved the reprimand under a collective bargaining agreement. It was at that time that defendant Kroeplin first suggested that defendant Cator was an informant and that Kroeplin was engaged in a law enforcement function when he requested plaintiff's motor vehicle record information. Following arbitration, the disciplinary letter was removed from defendant Kroeplin's personnel file.

## DISPUTED FACTS

### A. *Plaintiff's Factual Allegations*

Plaintiff alleges that, after defendant Bresnahan disclosed plaintiff's name to defendant Kroeplin, Kroeplin telephoned defendant Cator and disclosed plaintiff's identity. Plaintiff alleges that defendant Cator then looked up plaintiff's address in the local telephone directory and sped off to find plaintiff at his home, prompting defendant Kroeplin's second call to the Minocqua police department. Because the address listed in the phone directory was outdated and plaintiff's former residence was clearly abandoned, plaintiff alleges, defendant Cator returned home immediately.

Plaintiff alleges that sometime after September 20, 2004, his ex-wife, Annette Parus, told him she had "heard on the street" that defendant Kroeplin provided plaintiff's motor vehicle record information to defendant Cator. According to plaintiff, Annette Parus did not divulge the source of the rumor she heard. (In her deposition testimony, Annette Parus denied telling plaintiff that defendant Kroeplin had disclosed plaintiff's personal information to defendant Cator.)

### B. *Defendants' Factual Allegations*

Defendants allege that defendant Kroeplin responded to defendant Cator's request to run plaintiff's license plate because Cator was a Department of Natural Resources informant. According to defendants, Kroeplin believed defendant Cator wanted the information to further an investigation and not for any personal reason. Defendant Kroeplin avers that defendant Cator served as a confidential in-

formant for the Department of Natural resources for five years or more and that prior to September 20, 3004, defendant Cator had provided defendant Kroeplin with information about an illegal deer shooting, untended fishing tip-ups, and the name of a relative who was allegedly involved in a swan shooting. Defendant Kroeplin alleges that when he apologized to his supervisor for inappropriate conduct, he did so on the ground that he had used a relative as an informant and not for any other misconduct.

Defendant Cator alleges that when he left his home shortly before 2:45p.m. on September 20, 2004, he went to visit his grandmother. Because she was not at home, he returned to his residence, prompting defendant Kroeplin's third telephone call to the Minocqua police around 3:00 p.m.

Defendants allege that defendant Kroeplin never provided defendant Cator with plaintiff's motor vehicle record information.

## OPINION

Plaintiff contends that defendant Kroeplin violated the Driver's Privacy Protection Act twice: once when he obtained plaintiff's name from defendant Bresnahan and again when he allegedly revealed plaintiff's name to defendant Cator. In addition, plaintiff contends that defendant Cator violated the Act when he allegedly "conspired with" defendant Kroeplin to obtain plaintiff's motor vehicle record information and when he allegedly obtained plaintiff's motor vehicle record information.

The Driver's Privacy Protection Act of 1994 prohibits the release of a motorist's personal information (defined as "information that identifies an individual, including an individual's ... name [and] address") from the Department of Motor Vehicles database, with specific exceptions. 18 U.S.C. § 2725(3); 18 U.S.C. § 2721(a).

Among the Act's enumerated exceptions is § 2721(1)(b), which permits disclosure of personal information "for use by any government agency, including any ... law enforcement agency, in carrying out its functions." When personal information is released for a purpose not permitted under the Act, an individual whose information has been disclosed may bring suit in federal court against any person who has knowingly obtained, disclosed or used the information. 18 U.S.C. § 2724(a).

### A. *Kroeplin and the Law Enforcement Exception*

■ Plaintiff contends that defendant Kroeplin violated § 2721(a) when he obtained plaintiff's personal motor vehicle information from defendant Bresnahan for a non-law enforcement purpose. When defendant Cator telephoned his aunt on September 20, 2004, he asked her whether defendant Kroeplin would "run a license plate" for him. Defendant Kroeplin did so.

Although defendant Kroeplin did not indicate at the time that his attempt to run the license plate was related to a legitimate law enforcement function, he testified at his deposition that he requested the license plate information because defendant Cator was a confidential informant, who periodically provided him with information about hunting and fishing violations. Defendant Kroeplin asserts that he requested the license plate number for two reasons: (1) because he believed that defendant Cator needed the information to assist in an investigation and (2) because he wanted to "test" Cator's reliability by finding out whether the license plate information would lead to legitimate law enforcement information. Therefore, defendant Kroeplin contends, he was performing a legitimate law enforcement function at the time he obtained plaintiff's motor vehicle record information.

Plaintiff disputes defendant Kroeplin's motive and provides numerous reasons why Kroeplin's after-the-fact testimony is suspect. In his telephone conversation with defendant Bresnahan, defendant Kroeplin made no mention of defendant Cator's role as an informant. Moreover, defendants question whether defendant Cator ever served as an informant, since his name was never disclosed to the Department of Natural Resources as a source of information and no prosecutions ever resulted from the "leads" Cator is alleged to have given defendant Kroeplin over the years. Furthermore, after defendant Kroeplin obtained plaintiff's information and an internal investigation was conducted into Kroeplin's actions, Kroeplin did not tell his supervisor or the Minocqua police chief that he had obtained the information in furtherance of his duties as a conservation warden. It was only after defendant Kropelin received a disciplinary letter in his personnel file that he first alleged he had obtained plaintiff's information in a law enforcement capacity. Plaintiff contends that defendant Kroeplin's deposition testimony is incredible and that no reasonable jury could find that Kroeplin obtained plaintiff's information under § 2721(1)(b).

In deciding a motion for summary judgment, the court's sole duty is to determine whether a genuine issue exists for trial. *Id.* In this case, defendants have produced sworn deposition testimony in support of their version of events. Plaintiff has produced evidence that calls into question the credibility of defendants' testimony. Although the parties agree that defendant Kroeplin obtained information from plaintiff's motor vehicle record, they dispute his motive for doing so. The undisputed facts are sufficient to support a jury finding defendant Kroeplin obtained plaintiff's personal information from the Department of Motor Vehicles for a non-law enforcement purpose. Therefore, I will deny defendant's motion for summary judgment

with respect to plaintiff's claim that defendant Kroeplin violated the Driver's Privacy Protection Act when he obtained plaintiff's motor vehicle record information from defendant Bresnahan on September 20, 2004.

B. *Disclosure of Plaintiff's Motor Vehicle Record Information*

■ Next, plaintiff contends that defendants Kroeplin and Cator violated the Act when Cator requested and received plaintiff's motor vehicle record information (that is, his name) from Kroeplin. Defendants Cator and Kroeplin oppose plaintiff's motion on the ground that plaintiff has produced no evidence to support a finding that Kroeplin disclosed plaintiff's information to defendant Cator. Because plaintiff's claim that defendant Kroeplin disclosed his personal information to defendant Cator rests on sheer conjecture, I will grant the motion of defendants Cator and Kroeplin with respect to this claim.

According to plaintiff, after defendant Kroeplin obtained plaintiff's personal information from defendant Bresnahan, Kroeplin telephoned defendant Cator and told him that plaintiff was the owner of the vehicle parked in Erickson's driveway. As proof, plaintiff relies on two sources: a hearsay statement allegedly made by his ex-wife and a report written by defendant Kroeplin's supervisor, Thomas Wrasse, containing a hearsay statement purportedly made by Minocqua Police Chief Norbert McMahon (later repudiated by both McMahon and Wrasse). In addition, plaintiff contends that the facts speak for themselves and that the timing of undisputed events permits an inference that defendant Kroeplin revealed plaintiff's information to defendant Cator.

First, plaintiff has averred that his ex-wife, Annette Parus, told him that she "heard on the street" that defendant Kroeplin had told defendant Cator that the vehicle in question belonged to plaintiff.

According to plaintiff, his ex-wife never revealed the source of this rumor. However, in her sworn deposition testimony, Ms. Parus unequivocally denied having told plaintiff anything about Kroeplin. Plaintiff's affidavit testimony is inadmissible hearsay contradicted by the deposition testimony of his alleged source.

Plaintiff's second piece of purported evidence is Warden Thomas Wrasse's January 4, 2005 summary of his meeting with Minocqua Police Chief Norbert McMahon, which states, "McMahon indicated that [plaintiff's motor vehicle record] information was then transferred to Kropelin's nephew Andy Cater [sic] for non-law enforcement purposes." Plaintiff contends that this sentence would permit a jury to infer that defendant Kroeplin revealed plaintiff's personal information to defendant Cator. There are two problems with plaintiff's argument. First, the statements of McMahon contained in the Wrasse report are inadmissible hearsay. Second, both Wrasse and McMahon testified at deposition that McMahon never told Wrasse that defendant Kroeplin had disclosed plaintiff's personal information to defendant Cator. The report was, in McMahon's words, "poorly drafted." Not only is the statement ambiguous at best, it is inadmissible and contradicted by the sworn testimony of both parties to the conversation it purports to summarize.

Finally, plaintiff contends that a jury could find that defendant Kroeplin revealed plaintiff's identity to defendant Cator from (1) Cator's call to his aunt; (2) Kroeplin's call to the dispatcher; (3) Kroeplin's call to Cator; and (4) Kroeplin's second call to the dispatcher, reporting Cator's quick departure. From these facts and these facts alone, plaintiff argues, a jury could find that defendant Kroeplin disclosed plaintiff's personal information to defendant Cator.

A motion for summary judgment does not invite the court to weigh the evidence or determine the truth of the matters in dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, summary judgment is the moment in a lawsuit when a party must show what evidence it has that would convince a trier of fact to accept its version of the events. *Schacht v. Wisconsin Dept. of Corrections,* 175 F.3d 497, 504 (7th Cir.1999). To avoid summary judgment, the nonmoving party must "produce more than a scintilla of evidence to support his position." *Pugh v. City of Attica, Indiana,* 259 F.3d 619, 625 (7th Cir.2001). Plaintiff has failed to do so. His theory is mere conjecture, contradicted not only by the sworn testimony of defendants Cator and Kroeplin, but also by the uncontroverted testimony of Freja Van Skyhawk, who testified that she revealed plaintiff's identity to defendant Cator, in reliance on her own personal knowledge and not upon information from plaintiff's motor vehicle record. Plaintiff has failed to produce any evidence from which a reasonable jury could find by a preponderance of the evidence that defendant Kroeplin violated the Driver's Privacy Protection Act by illegally disclosing plaintiff's motor vehicle record information or that defendant Cator violated the Act by illegally obtaining the information.

### C. Conspiracy to Violate the Driver's Privacy Protection Act

Plaintiff contends that defendant Cator violated the Driver's Privacy Protection Act by conspiring with defendant Kroeplin to improperly obtain plaintiff's motor vehicle record information. Plaintiff contends defendant Cator can be held liable under the Act even if he never received plaintiff's motor vehicle record information, so long as he conspired with Kroeplin to obtain the information improperly. In support of this

argument, plaintiff relies upon two district court decisions, *Cowan v. Ernest Codelia, PC,* 149 F.Supp.2d 67 (S.D.N.Y.2001) and *Margan v. Niles,* 250 F.Supp.2d 63 (N.D.N.Y.2003).

Defendants contend and plaintiff admits there is no federal cause of action for conspiracy *per se.* However, plaintiff contends that "evidence of a conspiracy may be used to connect the actions of various defendants with a violation of the D[river's] P[rivacy] P[rotection] A[ct]." *Margan,* 250 F.Supp.2d at 76. Plaintiff cites *Cowan* as an example of a case in which liability under the Driver's Privacy Protection Act was premised on a "conspiracy theory."

In *Cowan,* 149 F.Supp.2d at 71, two plaintiffs brought suit against a law firm and three of its attorneys, contending that one of the defendants' agents impermissibly obtained the plaintiffs' motor vehicle record information as part of a "joint effort" to obtain the plaintiff's personal information in violation of the Driver's Privacy Protection Act. In ruling on defendants' motion for summary judgment, the court stated, "To establish a claim under the D[river's] P[rivacy] P[rotection] A[ct], the plaintiffs must establish: (1) that the defendants caused a D[epartment of] M[otor] V[ehicles] search to be made as to each plaintiff and (2) that the search was not permitted by any exception to the [Act]." *Id.* at 78. Because the defendants had allegedly joined together to "cause a search to be made" of the Department of Motor Vehicles database and to later use the personal information obtained from the plaintiffs' motor vehicle records, the court denied summary judgment. *Id.* at 79–80.

Although both *Cowan* and *Margan* recognized indirect theories of liability under the Driver's Privacy Protection Act, those cases are not binding on this court. Furthermore, insofar as they would permit defendants to be held liable under the Act for "causing a search to be made" of the Department of Motor Vehicles database, I find them unpersuasive.

 Section 2722(a) states, "It shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title." Section 2724(a) states, "A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains." The statutes prohibit knowingly obtaining, disclosing or using personal information from a motor vehicle record. They do not prohibit attempting to obtain such information or causing it to be obtained. The statutory language is unambiguous. Courts are responsible for faithfully applying laws as Congress drafted them. *Mojica v. Gannett Co., Inc.,* 7 F.3d 552, 559 (7th Cir. 1993). Because the Driver's Privacy Protection Act makes no provision for a cause of action founded upon indirectly obtaining a driver's motor vehicle record information, I will grant defendant Cator's motion for summary judgment with respect to plaintiff's claim that Cator violated the Act by conspiring with defendant Kroeplin to obtain plaintiff's motor vehicle record information.

## ORDER

IT IS ORDERED that

1) The motion for summary judgment filed by defendant Kroeplin is DENIED with respect to plaintiff's claim that Kroeplin violated the Driver's Privacy Protection Act by obtaining plaintiff's motor vehicle record information for a non-law enforcement purpose and GRANTED with respect to plaintiff's claim that Kroeplin violated the Act by disclosing plaintiff's motor

vehicle record information to defendant Cator;

2) The motion for summary judgment filed by defendant Cator is GRANTED.